**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

UNITED STATES OF AMERICA,

VERSUS

FERRY WILLIAMS

CRIMINAL

NO. 19-117-JWD-EWD

**RULING AND ORDER**

This matter is before the Court on a *Motion to Suppress* and an *Amended Motion to Suppress* (*"Motions"*) (Docs. 25 and 31) filed by the defendant Ferry Williams, ("Defendant" or "Mr. Williams"). The Government opposes the *Motions*. (Docs. 26 and 32.) On January 24, 2020, the Court held an initial evidentiary hearing on the *Motion to Suppress*, during which the Court granted Defendant's oral motion to file the *Amended Motion to Suppress*. (Doc. 29.) On February 14, 2020, the Court held an evidentiary hearing on the *Motions* and ordered post-hearing briefs. (Doc. 35.) The parties filed simultaneous briefs. (Docs. 44 and 45.) Defendant admitted in his brief that that based on the evidence at the hearing, there were no non-frivolous arguments to be made in support of the *Motions*. (Doc. 44.) Having considered the arguments raised by the parties, the facts, the applicable law, and for the reasons expressed below, Defendants' *Motions* are denied.

FACTUAL BACKGROUND

Defendant was indicted for one count of possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1). Discovery revealed that the government intended to introduce two oral statements by Defendant from two separate arrests on November 4, 2018 and February 11, 2019. Both arrests were preceded by warrantless traffic stops. (Doc. 31-1 at 1.)

    a. *November 14, 2018 traffic stop*

1

On November 14, 2018, Corporal James Thomas, Jr., who works in the Baton Rouge Police Department Street Crimes Division, arranged for a confidential informant to meet Defendant at the RaceTrac on Old Hammond Road to purchase heroin. (Doc. 38 at 56:2-57:5.) When Defendant arrived at the RaceTrac, the confidential informant identified the Silver GMC Pickup Track as Defendant's vehicle and identified Defendant as the person from whom the confidential informant bought heroin. (Doc. 38 at 56:23-57:5.) Corporal Thomas observed Defendant turn right out of the parking lot without using his turn signal. (Doc. 38 at 57:6-57:12.) Corporal Thomas was in an unmarked vehicle and needed to maintain his cover, so he notified Officer Gabrielle Collins, who was patrolling the area, of his observations so that she could conduct the traffic stop. (Doc. 38 at 57:13-58:2.)

When Officer Collins received the radio contact from Corporal Thomas that Defendant's Silver GMC had failed to use a turn signal, she conducted a traffic stop that was captured on her in-car dash camera. (Doc. 38 at 63:22-64:5; *see* Government Exhibit 8.) Defendant did not stop when Officer Collins activated her lights. (Doc. 38 at 65:19-65:24.) When Defendant did not stop his vehicle, Officer Collins called for backup and other officers including Sergeant Lorenzo Coleman, converged on Defendant's vehicle to assist in the stop. (Doc. 38 at 70:7-70-23; Government Exhibit 9.) Body camera recordings from the officers at the scene show heroin on the floorboard of Defendant's vehicle. (Doc. 38 at 74:25-75-1; Government Exhibit 10.) Body camera recordings also recorded Corporal Ronald Norman reading Defendant his *Miranda* warnings and Defendant responding "Yes," that he understood his rights. (Doc. 38 at 76:24-77:13.)

After Defendant was arrested, he was transferred to the First District Police station where Corporal Thomas questioned him. (Doc. 38 at 58:24-59:5.) Corporal Thomas read Defendant his

*Miranda* warnings prior to questioning him and had no reason to believe that Defendant did not understand his rights. (Doc. 38 at 59:6-12.) After receiving his *Miranda* warnings, Defendant admitted to selling heroin. (Doc. 38 at 59:13-18.)

b.  *February 11, 2019 traffic stop*

Starting in January of 2019, the East Baton Rouge Sheriff's Office Narcotic's Division conducted surveillance of a café where Defendant worked, and on Defendant's residence because Defendant was suspected of selling heroin. (Doc. 37 at 8:10-16.) This surveillance included controlled purchases with confidential informants and led to the probable cause on two search warrants signed by the Honorable Judge Bonnie Jackson of the 19th Judicial District: one for the café at which Defendant worked and one for his residence. (*Id.* at 8:17-20; *see* Government Exhibit 4; *see* Government Exhibit 5.) Six days later, on February 11, 2019, Sergeant Nathan Harrison observed as Defendant left his residence and conducted three different hand-to-hand transactions of heroin before driving back towards his residence. (Doc. 37 at 29:24-32:2.)

Captain Tanner Jenkins decided to conduct a traffic stop before Defendant returned to his residence because of the observed hand-to-hand transactions and for officer safety. (Doc. 37 at 10:5-18.) As Sergeant Harrison explained

> [Defendant] was going to get stopped. Our goal when we set up surveillance on him that morning was to stop and take him into custody for the purchases and the buys that we had already done from him. So he was going to be placed under arrest whenever we made contact with him that day.

(Doc.37 at 42:5-10.)

Captain Jenkins was at the scene of the traffic stop and observed in plain view a clear condiment container with foil packages of heroin. (Doc. 37 at 11:23-12:5.) Captain Jenkins advised Defendant of his *Miranda* rights from memory when he was removed from the vehicle.

3

(Doc. 37 at 12:23-13:3.) After escorting Defendant to his residence, Captain Jenkins also read Defendant his *Miranda* rights from an app on his phone. (Doc. 37 at 13:11-25.)

Sergeant Harrison conducted the interview of Defendant in his unit on the way to the Sherriff's Office; the interview was recorded. (*See* Government Exhibit 6.) During the interview Sergeant Harrison asked if Defendant had been read his rights, to which Defendant responded that a bald guy read him his rights. (Doc. 37 at 34:20-25.) During the interview, Defendant admitted that he sold heroin, also referring to it as "H". (Doc. 37 at 36:20-24.) Sergeant Harrison did not force Defendant to give statements or put his hands on Defendant during the interview. (Doc. 37 at 37:13-21.)

## DISCUSSION

a. *Parties' arguments*

In the post-hearing briefing, Defendant concedes that:

> The evidence received compels the conclusion that Ferry Williams was in lawful custody and advised of his *Miranda* warnings prior to giving statements to law enforcement on November 14, 2018, and February 11, 2019. Therefore the defendant's statements were constitutionally obtained, and to argue otherwise under the present record would be frivolous.

(Doc. 44 at 6.) The Government also maintains that the *Motions to Suppress* should be denied. The Court agrees with the parties.

b. *Applicable law*

1. <u>Traffic stops are seizures under the Fourth Amendment</u>

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. Const. amend. IV). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon law enforcement agents and other government officials in order to prevent

4

arbitrary invasions of the privacy and security of citizens." *Id.* (citing *Delaware v. Prouse,* 440 U.S. 648, 653–654, 99 S. Ct. 1391, 59 L.Ed.2d 660 (1979)).

Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. at 653; *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000). The Fifth Circuit analyzes the constitutionality of traffic stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968). *United States v. Berry*, No. 15-30196, 2016 WL 7030331 (5th Cir. Dec. 1, 2016) (per curiam). *Terry* articulated a two-part test, which asks: (1) whether the officer's action was "justified at its inception," and (2) whether the officer's subsequent actions were "reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20); *see also*, *e.g.*, *United States v. Fajardo-Guevara*, 507 F. App'x 365, 366 (5th Cir. 2013) (per curiam) ("The legality of a traffic stop is examined under the two-pronged analysis described in *Terry*[.]"); *United States v. Castro*, 480 F. App'x 782, 784 (5th Cir. 2012) (same).

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Lopez-Moreno*, 420 F.3d at 430 (citing *United States v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995)). "The Supreme Court has stated that in making a reasonable suspicion inquiry, a court 'must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.' " *Lopez-Moreno*, 420 F.3d at 430 (quoting *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)). The Fifth Circuit has "stated previously that reasonable suspicion exists when the officer can point to specific and articulable

5

facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Lopez-Moreno*, 420 F.3d at 430 (citing *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir.2002)).

"Under the second prong of the *Terry* test, the question before the court is whether [the officers'] actions after [they] legitimately stopped the [car] were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). "This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id.* (citations omitted). Phrased another way, "[a]n officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *Berry*, 2016 WL 7030331, at *4 (quoting *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010)).

"[A]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Berry*, 2016 WL 7030331, at *4 (quoting *Rodriguez v. United States*, ––– U.S. –––, 135 S. Ct. 1609, 1614, 191 L. Ed. 2d 492 (2015)). "For instance, '[i]f all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop.'" *Id.* (quoting *United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006)). "[C]ontinued questioning thereafter unconstitutionally prolongs the detention." *Lopez-Moreno*, 420 F.3d at 431 (citing *Brigham*, 382 F.3d at 510). "A stop may only be further extended if law enforcement 'develops reasonable suspicion of additional criminal activity in the meantime.'" *Id.* (quoting *Pack*, 612 F.3d at 350).

6

"[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Lopez-Moreno*, 420 F.3d at 431 (citing *Brigham*, 382 F.3d at 507).

In evaluating *Terry* stops, "district courts [are required] to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *Brigham*, 382 F.3d at 507.  Again, "[t]he Supreme Court has long held that the touchstone of Fourth Amendment analysis is reasonableness. Reasonableness requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement." *Id.* (citations and quotations omitted).  "Reasonableness, measured in objective terms by examining the totality of the circumstances, eschews bright-line rules, instead emphasizing the fact-specific nature of the inquiry." *Id.* (citations, alterations, and quotations omitted). The Court must "consider each of [the relevant] factors in turn" and "consider whether these factors constitute specific and articulable facts which, when considered along with whatever reasonable inferences may be drawn from them, would allow a reasonable person to suspect that [the Defendant] was engaging in illegal activity." *Lopez-Moreno*, 420 F.3d at 433 (citation omitted).  The Court must "pay heed to the Supreme Court's admonition not to treat each factor in isolation, but rather to give due regard to the totality of the circumstances." *Id.* (citations omitted).

"Finally, the Supreme Court has emphasized that courts must allow law enforcement officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an

7

untrained person." *Brigham*, 382 F.3d at 507. (citation and quotation omitted). Courts "traditionally give due deference to the experience of officers . . . in identifying a number of factors that, although insufficient by themselves to suggest illegal activity, taken together are indicia of certain types of illicit acts.' " *Berry*, 2016 WL 7030331, at *5 (quoting *United States v. Sanchez–Pena*, 336 F.3d 431, 437 (5th Cir. 2003)). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' " *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868)). "It is also clear, however, that reasonable suspicion need not rise to the level of probable cause." *Lopez-Moreno*, 420 F.3d at 430 (citing *Arvizu*, 534 U.S. at 274, 122 S. Ct. 744).

2. <u>Warrantless searches of automobiles are permitted by the Fourth Amendment, if supported by probable cause.</u>

"Warrantless searches are per se unreasonable under the Fourth Amendment, subject to a few specific exceptions." *United States v. Guerra*, 605 F. App'x 295, 297 (5th Cir.), *cert. denied,* 136 S. Ct. 262, 193 L. Ed. 2d 193 (2015) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L.Ed.2d 854 (1973)). "Because the court is asked to consider a warrantless search and seizure, the Government has the burden of proving, by a preponderance of the evidence, that the search and seizure were constitutional." *Id.* (citing *United States v. McKinnon,* 681 F.3d 203, 207 (5th Cir.2012)).

"It is well-established that warrantless searches of automobiles are permitted by the Fourth Amendment if supported by probable cause." *United States v. Ned*, 637 F.3d 562, 567 (5th Cir. 2011) (citing *United States v. Seals,* 987 F.2d 1102, 1107 (5th Cir.1993)). Under the "automobile exception," "in cases where there was probable cause to search a vehicle 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a*

8

*warrant has not been actually obtained.*" *Maryland v. Dyson*, 527 U.S. 465, 466–67, 119 S. Ct. 2013, 2014, 144 L. Ed. 2d 442 (1999) (per curiam) (emphasis in original) (quoting *United States v. Ross*, 456 U.S. 798, 809, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982)).

"A warrantless search is permissible under the automobile exception if (1) the officer conducting the search had 'probable cause to believe that the vehicle in question contain[ed] property that the government may properly seize'; and (2) exigent circumstances justified the search." *Berry*, 2016 WL 7030331, at *6 (quoting *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (alteration in original) (quoting *United States v. Reyes*, 792 F.2d 536, 538 (5th Cir. 1986)))[1] Concerning the second requirement, "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." *Dyson*, 527 U.S. at 467, 119 S. Ct. at 2014 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996) (per curiam)); *United States v. Sinisterra*, 77 F.3d 101, 104 (5th Cir. 1996) ("a finding of exigent circumstances other than the fact of the automobile's potential mobility" is not required for the automobile exception to apply). Concerning the first requirement, "[u]nder the 'automobile exception' to the warrant requirement, officers may conduct a search if they have probable cause to believe that the vehicle contains contraband or evidence of a crime." *Ned*, 637 F.3d at 567 (citing *United States v. Buchner,* 7 F.3d 1149, 1154 (5th Cir.1993)); *United States v. Wilson,* 77 F.3d 101, 105 (5th Cir.

---

[1] Quoting *California v. Carney*, 471 U.S. 386, 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985), the Fifth Circuit has stated:
> When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes—temporary or otherwise—the two justifications for the vehicle exception come into play. First, the vehicle is obviously readily mobile by the turn of an ignition key, if not actually moving. Second, there is a reduced expectation of privacy stemming from its use as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling. . . . Our application of the vehicle exception has never turned on the other uses to which a vehicle might be put. The exception has historically turned on the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation.

*Ned*, 637 F.3d at 567 (quoting *Carney*, 471 U.S. at 392–93, 105 S. Ct. 2066).

1996) ("if, under the totality of the circumstances, officers have probable cause to believe that a vehicle contains contraband, they are authorized to search [it] without a warrant." (citations omitted)).

"Probable cause exists when facts and circumstances within the knowledge of the arresting officer would be sufficient to cause an officer of reasonable caution to believe that an offense has been or is being committed." *Ned*, 637 F.3d at 567 (quoting *United States v. Carrillo–Morales,* 27 F.3d 1054, 1062 (5th Cir.1994)). "A determination of probable cause is also based on the totality of circumstances and must be predicated on more than a 'bare suspicion.' " *Guerra*, 605 F. App'x at 297 (citing *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010)).

3. Miranda warnings

The Fifth Amendment provides in relevant part that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda*, the Supreme Court concisely laid out its holding with respect to this amendment as follows:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not

> deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

*Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966).

"There is no talismanic incantation of phrases required to satisfy the strictures of *Miranda*." *United States v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005) (citing *California v. Prysock*, 453 U.S. 355, 359, 101 S. Ct. 2806, 69 L. Ed. 2d 696 (1981)). "Nevertheless, the *Miranda* safeguards are 'most commonly satisfied by giving the defendant the customary *Miranda* warnings: That he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that an attorney will be provided for him if he cannot afford to hire one.'" *Id.* (quoting *United States v. Andrews*, 22 F.3d 1328, 1337 (5th Cir. 1994)).

"A valid *Miranda* waiver requires two distinct components." *United States v. Hearn*, 563 F.3d 95, 104 (5th Cir. 2009). "'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (quoting *Cardenas*, 410 F.3d at 293 (citation omitted)). "'Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Cardenas*, 410 F.3d at 293). The Government has the burden of proving a waiver of the Defendant's *Miranda* rights by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S. Ct. 515, 522–23, 93 L. Ed. 2d 473 (1986).

   c. *Analysis*

As conceded by Defendant in his post-hearing brief, the evidence presented at the February 19, 2020 hearing shows: (1) that the traffic stops on both November 14, 2018 and

February 11, 2019 were lawful; and (2) that Defendant was properly advised of his *Miranda* rights and indicated that he understood his rights prior to his giving statements.

1. November 14, 2018

Specifically, as to whether the November 14, 2018 traffic stop was constitutional under the Fourth Amendment, the Court finds that the traffic stop was both "justified at its inception" and the officer's subsequent actions were "reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20). The traffic stop was justified at its inception when Corporal Thomas observed Defendant failing to use his turn signal when exiting the parking lot. The resulting search of Defendant's vehicle was reasonably related to the circumstances that justified the stop in the first place, especially considering Defendant's failure to pull over when Officer Collins turned on her lights and that the confidential informant had identified Defendant as his source of heroin and his identified his truck at the RaceTrac meet up point for the controlled buy.

Further, given that Defendant had arranged to meet for a controlled buy, there was probable cause to believe that Defendant's truck contained heroin. *Ned*, 637 F.3d at 567 (quoting *United States v. Carrillo–Morales,* 27 F.3d 1054, 1062 (5th Cir.1994)) ("Probable cause exists when facts and circumstances within the knowledge of the arresting officer would be sufficient to cause an officer of reasonable caution to believe that an offense has been or is being committed.") As the car was readily mobile and probable cause existed, the warrantless search of the vehicle was permissible. *Dyson*, 527 U.S. at 467, 119 S. Ct. at 2014 ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more.").

12

Last, as to the November 14, 2018 statements, the evidence shows that Defendant was advised of his *Miranda* rights both at the traffic stop and at the police station and Defendant indicated that he understood those rights prior to any statements being made. There is no evidence that Defendant was intimidated, tricked or coerced into waiving his *Miranda* rights. Therefore, Defendant validly waived his *Miranda* rights prior to making statements following the November 14, 2018 traffic stop.

2. February 11, 2019

As to whether the traffic stop on February 11, 2019 was constitutional, the evidence shows that the arresting officers had probable cause to conduct the traffic stop of Defendant given their previous controlled buys, ongoing surveillance and the three alleged hand-to-hand transactions observed by Sergeant Harrison that morning. *United States v. Guzman*, No. SA-13-CR-00089-DAE, 2013 WL 4097433, at *5 (W.D. Tex. Aug. 13, 2013), *aff'd* (Feb. 3, 2015) ("an experienced police officer's observation of a hand-to-hand exchange or transaction supports a finding of probable cause."); *Dyson*, 527 U.S. at 467, 119 S. Ct. at 2014 ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more."). Further, after conducting the traffic stop, the evidence shows that there was a clear condiment container with foil packets of heroin in plain view on the center console. Given the totality of these circumstances it was reasonable for the officers to arrest Defendant and transport him to his residence prior to executing the search warrant of the residence.

The evidence also shows that Defendant was advised by Captain Jenkins of his *Miranda* rights, both at the scene of the traffic stop and at his residence. Captain Jenkins credibly testified that Defendant indicated he was aware of his *Miranda* rights. Moreover, in the recording of Sergeant Harrison's interview with Defendant, Defendant indicates that a bald-guy read him is

13

*Miranda* rights. There is no evidence that Defendant was intimidated, tricked or controlled into waiving his *Miranda* rights. Therefore, Defendant validly waived his *Miranda* rights prior to making statements following the February 11, 2019 traffic stop.

CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion to Suppress* and the *Amended Motion to Suppress* (Docs. 25 and 31) filed by Defendant, Ferry Williams, are **DENIED.**

Signed in Baton Rouge, Louisiana, on May 21, 2020.

**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**